(No. 23043. )

THE LEWIN METALS CORPORATION, Defendant in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(MINNIE CARLETON, Plaintiff in Error.)

*Opinion filed February 14, 1936—Rehearing denied April 15, 1936.*

J. E. FLEMING, JAMES K. MORAN, and JORDAN CLARK, for plaintiff in error.

A. B. FREY, and ANGERSTEIN, PIGGOTT & ANGERSTEIN, for defendant in error.

Mr. Justice Jones delivered the opinion of the court:

The Industrial Commission confirmed the award of an arbitrator in favor of Minnie Carleton, widow of William Carleton, upon her application for compensation on account of his death, alleged to have resulted from lead poisoning contracted while in the employ of the Lewin Metals Corporation. The circuit court of St. Clair county reversed and set aside the award and the cause is here on writ of error.

The immediate cause of decedent's death was pneumonia. Plaintiff in error claims that decedent contracted lead poisoning, which together with a then weakened physical condition due to another disease, predisposed him to pneumonia. Defendant in error claims that decedent did not have lead poisoning; that the predisposing cause of death was lymphatic leukemia, a fatal disease, and that if he did have lead poisoning, plaintiff in error failed to establish which of the two disorders caused his death. The question presented is whether or not the finding of the Industrial Commission is so manifestly against the weight of the evidence as to justify the circuit court in setting it aside.

Defendant in error's principal business is smelting copper, lead and other metals. Decedent worked in the solder room for about a year next prior to his last illness, making solder and babbitt from molten lead and tin. There were sulphur fumes where he worked and some dust and smoke from the anode furnace. Prior to his employment at defendant in error's plant, he worked for the General Metal Refining Corporation in St. Louis, which was engaged in the smelting of metals, but the record does not show his duties.

During the year 1931, with the exception of one or two days at a time, decedent worked continuously in the solder room. On November 30, 1931, after working about an hour, he was so sick he could hardly stand and was sent home. The next day Dr. C. L. Munson was called.

He diagnosed the case as lead poisoning, and decedent was under his care until January 5, 1932. After that, he was treated by Dr. E. C. Funsch, who took him to St. Mary's Hospital in St. Louis, where he died on January 25.

Dr. Munson took decedent to the Gradwohl Laboratories in St. Louis on December 1 where urinalyses and blood examinations were made. The finding in the urinalysis of December 1, 1931, was "positive for lead." A subsequent urinalysis, dated January 6, 1932, showed "positive for lead. Small amount of black lead sulphide as precipitate." Two blood examinations dated December 2, 1931, and January 5, 1932, were made by the same laboratories. They showed a decrease of hemoglobin from forty per cent to thirty-four per cent. The reports showed the red cell count of the blood was about half the normal count. The white cell count was more than twice the normal count. Dr. Munson testified that when he was first called, decedent had a headache and was constipated. He was confined to his bed practically all the time while under his care. The laboratory reports were used in making his diagnosis. The white cell count in the blood showed an increase over normal, indicating an anemic condition and a destruction of the red cells. He treated decedent for lead poisoning, but he stated Carleton possibly had some other trouble, although he could not determine just what it was.

The hospital records from January 6 to the date of decedent's death show an increase of red blood cells and an increase in the hemoglobin estimation from twelve per cent to twenty-one per cent. The first laboratory examination at the hospital showed polychromatic degeneration of many red cells. The record on January 8 indicates the beginning of peneumonia. While decedent was in the hospital, two blood transfusions were administered.

Defendant in error called as witnesses, Doctors E. C. Funsch, D. L. Harris and W. F. McNary; Dr. R. B. H.

Gradwohl, a specialist in laboratory diagnosis, and Dr. Michael Soimogyi, a biochemist of the Jewish Hospital in St. Louis. Their testimony shows that the cause of lymphatic leukemia is unknown; that the most predominating symptom is weakness and it lowers the disease resistance of the body; that it has no connection with lead poisoning; that lead poisoning also causes the lowering of the disease resistance of the body, and that if a man had leukemia and lead poisoning, his resistance to disease would be lowered by both. Dr. Funsch testified the decedent was suffering from lymphatic leukemia; that the excessive white cell count and the presence of young lymphocytes in the blood are significant of lymphatic leukemia; that if a man works in a lead plant he is likely to absorb lead, that if an urinalysis shows lead, it may be thrown off as fast as it is taken in and, if so, it does no harm, but if lead accumulates in the body faster than it can be thrown off, the result is lead intoxication or lead poisoning; that in lead poisoning alone there would not be such an excessive white cell count as was shown by Dr. Gradwohl's reports; that the white cell count was due to lymphatic leukemia; that he found no evidence that the decedent was suffering from lead poisoning; that basophilic punctation is found in lead poisoning, and that he found no basophilic punctation, but on re-direct examination he stated he found polychromasia, which is present in extreme anemias and lead poisoning.

Dr. Gradwohl testified that the polychromasia found in the blood examination of December 2 indicated lead poisoning; that polychromasia and basophilic punctation which were found in the second blood examination were signs of release from the bone marrow of immature red cells and could suggest lead poisoning, anemia or any blood disturbance where bone marrow is involved; that the findings would be indicative of lymphatic leukemia only because in that disease there is a secondary anemia; that the posi-

tive lead finding in both urinalyses he made is a very important symptom, and that if a man has been disabled for a month, confined to his home, and has not been any place where lead was used and a urinalysis showed positive for lead, he would say that the man had lead poisoning.

Dr. Soimogyi testified that at the request of Dr. Funsch he made an urinalysis of a twenty-four hour specimen of decedent's urine about January 10 and found no lead.

Dr. Harris testified he made an examination of decedent's blood and found a great increase in the white blood cells, a great predominance of lymphocytes and the absence of any changes in the blood indicative of lead poisoning, which always manifests itself by the presence of imperfectly formed red blood cells from bone marrow; that his diagnosis was that decedent was suffering from lymphatic leukemia; that lead poisoning has practically no effect upon the blood count or the lymphocytes; that basophilic degeneration or punctation is evidence that immature blood cells are being thrown into the circulation and is present in lead poisoning; that if lead is detected chemically in an urinalysis, it would not be caused by leukemia. But in answer to a hypothetical question embracing the time and conditions of decedent's employment, the history of his illness and death from pneumonia, after two blood transfusions during nine days' stay in a hospital, and the urinalyses and blood examination showing basophilic punctation, the witness answered that with only those facts before him, he would be inclined to say that lead poisoning was a very active factor in the death. To two other hypothetical questions, including the factors shown by Dr. Gradwohl's blood examinations, he answered that the man may have had lead poisoning but certainly he had a leukemia. The witness also testified that before he could say, from a subsequent negative urinalysis, that the man did not have lead poisoning, he would want to know if the examination of the blood showed any evidence of basophilic punctation, which

is commonly associated with lead poisoning; and that if pneumonia developed in a patient having leukemia and lead poisoning, the cause of death would be pneumonia, but both disorders would be determining factors.

Dr. McNary testified that he did not treat decedent but examined him; that from the examination and the hospital report, it was his opinion decedent suffered from lymphatic leukemia; that he did not find lead poisoning; that lead poisoning causes some forms of anemia to a certain degree, produces loss of appetite and a general run down condition of the body if it progresses far enough; that he had never seen the hemoglobin as low as twelve per cent in lead poisoning and had never known death to result from that disorder; that lead is not found in leukemia cases; that he made no urine test or blood examination and saw decedent only once, and that if an urinalysis positive for lead is made about a month after a patient has been disassociated with lead or lead products, the result would not be expected in a leukemia case and would indicate that the patient had absorbed lead.

Briefly summarized, the testimony of all of defendant in error's witnesses shows that decedent, at the time he was stricken with his fatal illness, was weak and in an anemic condition, which continued till the date of his death; that at the onset of his illness and a month later, urinalyses showed a definite lead content; that while the cause of lymphatic leukemia is unknown, the presence of polychromasia and basophilic punctation, in combination, quite definitely indicate lead poisoning. Although the witnesses testified they had never known of a case where a patient had both diseases at the same time, it is not shown, or claimed, that the lymphatic leukemia may not have been caused by, or associated with, a decline in physical resistance initiated by lead poisoning. The testimony shows that decedent suffered from both disorders and that each of them tended to lower his resistance to disease and create a fertile con-

dition for the development of pneumonia. Dr. Munson diagnosed decedent's ailment as lead poisoning. He gradually declined and the doctor testified that at the time he was taken from his care, it was his opinion the patient would die. Dr. Munson has had an experience of twenty-nine years and the fact that at the time he testified he had forgotten the normal blood cell count, does not detract from the weight of his testimony. He refreshed his memory at the time of his diagnosis.

It was incumbent upon plaintiff in error to show that decedent's death arose out of a disability arising out of and in the course of his employment; in other words, that the pneumonia from which he died was the result of a weakened condition arising from lead poisoning contracted while in defendant in error's employ. (*Standard Oil Co.* v. *Industrial Com.* 339 Ill. 252.) Liability cannot be determined by a choice between two views equally compatible with the testimony, but in order to justify a recovery the evidence must show a causal connection between the injury sustained in the course of the employment and the ensuing death. However, this does not mean that where there is a conflict in the testimony, there can be no recovery. The rule of law is that it is the province of the Industrial Commission to draw reasonable inferences from facts and circumstances in evidence and its finding upon a contested issue of fact will not be set aside by the court unless such finding is manifestly against the weight of the evidence. (*Plano Foundry Co.* v. *Industrial Com.* 356 Ill. 186.) The cause of death in this case was a scientific question. The testimony of the witnesses for both parties was sufficient to justify the commission in finding that lead poisoning was the predisposing cause of death.

The judgment of the circuit court is reversed and the cause is remanded with directions to enter an order confirming the award of the Industrial Commission.

*Reversed and remanded, with directions.*